UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. BARBARA MEGAN MULLINS and CHRISTOPHER CALEB MULLINS, Defendants. | No. 3:24-CR-48 Judges Varlan / Poplin |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Defendants were charged in a twenty-count Indictment with conspiracy to commit health care fraud and other related offenses. At its core, the Indictment alleges that the defendants conspired to defraud, and devised a scheme to defraud, a health care benefit program: the Energy Employees Occupational Illness Compensation Program Act ("EEOICPA"). As alleged in the Indictment, the EEOICPA provides both compensation and medical benefits to qualifying Department of Energy employees, vendors, contractors, and subcontractors diagnosed with occupational illnesses causally linked to toxic exposures during their employment.

Defendants moved to dismiss Counts One through Fifteen of the Indictment, arguing that the EEOICPA is not a "health care benefit program," as that term is defined in 18 U.S.C. § 24(b). But the Indictment adequately alleges that it is, and thus factual disputes exist that must be settled by a jury. As a result, the issues raised in defendants' motion cannot be determined "without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Their motion should be denied.

**SUMMARY OF THE ALLEGATIONS**

The Indictment alleges that from around April 2014 through in or around October 2023, the Defendants conspired with each other—and others not named in the Indictment—to create

and submit for payment fraudulent claims for home health services that were not provided as claimed. [Doc. 3, Indictment ¶ 1.] Defendants submitted those fraudulent claims to the U.S. Department of Labor, Office of Worker's Compensation Program, Division of Energy Employees Occupational Illness Compensation (collectively, "DOL"), which administered the EEOICPA. [*Id.* ¶ 11.] The EEOICPA provides medical benefits to qualifying beneficiaries, including home health care. [*Id.* ¶¶ 1, 9-10, 14.]

**A. The EEOICPA**

The Indictment explains at length how the EEOICPA, administered by DOL, operates as a "health care benefit program," as defined in 18 U.S.C. § 24(b). [Doc. 3, Indictment ¶¶ 8-33.] Here is how it works: Qualifying beneficiaries under the EEOICPA receive a Medical Benefits Identification Card (commonly referred to as a "white card") imprinted with the beneficiary's name, case identification number, DOL group number, and DOL logo. [*Id.* ¶ 12.] Healthcare providers who wish to provide services to beneficiaries and submit payment claims to DOL are required to apply for enrollment in the program. [*Id.* ¶ 13.] If DOL accepts the application, DOL assigns the applicant a provider number. [*Id.*] Enrolled providers then submit billing statements and claims for payment to DOL; the claims are required to include supporting evidence showing that the services were provided and were medically necessary. [*Id.* ¶¶ 15-18.]

Enrolled providers must use specific billing codes when submitting payment claims to DOL. [*Id.* ¶¶ 22-24.] Medical benefits are not provided to beneficiaries unless they receive a Letter of Medical Necessity from their treating physician explaining what services are medically necessary. [*Id.* ¶¶ 25-27.] That decision is not permanent. [*Id.* ¶ 29.] DOL authorizes beneficiaries to receive medical benefits, including home health services, for six months at a time. [*Id.*] At the end of each six-month period, a beneficiary is required to have a face-to-face

evaluation with their treating physician, who may submit a new Letter of Medical Necessity. [*Id.*] Beneficiaries can select to receive medical benefits from any enrolled provider. [*Id.* ¶ 31.]

**B. The Fraud Scheme**

Defendants' home health company, Patriot Homecare, was enrolled with DOL as a home health agency. [*Id.* ¶ 37.] Defendants controlled all aspects of Patriot Homecare. [*Id.* ¶ 38.] They recruited patients to Patriot Homecare by telling them that Patriot Homecare would employ a family member as their non-skilled caregiver and would pay their family member an hourly wage for each hour claimed on their caregiver notes. [*Id.* ¶ 41.] Defendants told prospective patients that their caregiver did not have to be in their home during all their charted hours as long as the caregiver was available or "on call" if the patient needed them. [*Id.*]

Defendant Megan Mullins knowingly hired caregivers with other full-time jobs and coordinated their schedules to make sure their charted hours did not conflict with the hours they worked at other jobs, including scheduling caregivers in the early mornings, late evenings, or even overnight, knowing it would be impossible for the caregivers to work those hours. [*Id.* ¶ 43.] Defendants falsely told patients and caregivers that if the patient did not use all their DOL-approved hours each month, the patient would lose their DOL-approved hours or have them reduced. [*Id.* ¶ 47.] As a result, caregivers and even patients in some instances prepared false caregiver notes claiming that the caregiver was in the patient's home providing the claimed services when, in fact, the caregiver was not in the patient's home. [*Id.* ¶ 48.] Defendants monitored caregiver notes for each patient, tracking the total number of hours claimed and comparing those hours to the total number of DOL-approved hours for each patient. [*Id.* ¶ 55.]

Defendant Megan Mullins not only orchestrated the fraud scheme; she executed it herself by preparing false caregiver notes claiming that she provided non-skilled home care to Patriot Homecare patient J.E. every Saturday and Sunday—ten hours each day—for more than a year.

[*Id.* ¶ 56.] She prepared false caregiver notes claiming she was at J.E.'s home when, in fact, she was on vacations in Las Vegas, Florida, New York City, and other places. [*Id.* ¶ 57.] When a Patriot Homecare employee approached the Defendants and questioned them about the arrangement with J.E., Defendant Megan Mullins stopped preparing caregiver notes and arranged for another employee, S.H., to falsely prepare caregiver notes for J.E. [*Id.* ¶ 58.]

For years, defendants concealed the conspiracy by instituting a sham auditing process of caregiver notes designed to ensure that DOL would pay the claims irrespective of whether the caregivers actually provided the services as claimed. [*Id.* ¶ 78.] Defendants paid their primary biller an above-market salary, took her on paid vacations, and bought her gifts so she would continue to submit false and fraudulent payment claims. [*Id.* ¶ 81.] They also gave gifts and bribes to patients who allowed the scheme to continue or actively participated in it. [*Id.* ¶ 82.] They limited their employees from reviewing patient files or providing oversight of caregivers and nurses, and they fired employees who questioned whether caregivers and nurses provided the hours claimed. [*Id.* ¶¶ 83, 84.] The scheme lasted nine-and-a-half years. [*Id.* ¶¶ 1, 35.]

**LEGAL STANDARD**

Federal Criminal Rule of Procedure 12(b)(3) provides that certain motions, including a motion to dismiss for failure to state an offense, "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 7 sets forth the pleading standard for an indictment, which "must be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

An indictment is constitutionally sufficient "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and,


Case 3:24-cr-00048-TAV-DCP Document 64 Filed 05/12/25 Page 4 of 17 PageID #: 655

second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001); *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) ("An indictment is generally sufficient if it 'fully, directly, and expressly . . . set[s] forth all the elements necessary to constitute the offense intended to be punished.'") (quoting *United States v. Douglas*, 398 F.3d 407, 411 (6th Cir. 2005) (alteration in original)).

To be legally sufficient, "'the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime.'" *Landham*, 251 F.2d at 1079 (quoting *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir.1992)). The statutory language used in an indictment must "be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117-18; *see also Douglas*, 398 F.3d at 413 (stating that an indictment must "set out all of the elements of the charge[d] offense and must give notice to the defendant of the charges he faces" and "be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts").

A Rule 12(b)(3)(B)(v) motion is appropriate only "when it raises questions of law rather than fact." *United States v. Ali*, 557 F.3d 715, 719 (6th Cir. 2009) (holding that a Rule 12 motion was appropriate because it "raise[d] a purely legal question about whether the indictment stated an offense"); *see also, e.g.*, *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992) (holding that a Rule 12 motion was inappropriate because it required the court to "invade the province of the ultimate finder of fact"). "[A] court cannot consider a factual challenge to an indictment purporting to show a defect consisting solely of insufficient evidence to prove a particular

charge." *United States v. Hann*, 574 F. Supp. 2d 827, 830 (M.D. Tenn. 2008). Accordingly, an indictment that is valid on its face may not be dismissed on the ground that it is based on inadequate or insufficient evidence. *United States v. Williams*, 504 U.S. 36, 54 (1992). "[C]ourts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." *United States v. Assad*, No. 2:18-CR-140, 2019 WL 3945389, at *5 (E.D. Tenn. Aug. 21, 2019).

When evaluating a motion to dismiss, "[t]he indictment must be read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications." *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007) ("An indictment is to be construed liberally in favor of its sufficiency."). Courts reviewing a motion to dismiss for failure to state an offense "do not evaluate the evidence upon which the indictment is based." *Landham*, 251 F.3d at 1080. "[T]he prosecution's evidence is tested at trial, not in a preliminary proceeding." *United States v. Short*, 671 F.2d 178, 183 (6th Cir. 1982) (reversing a district court's dismissal of an indictment before trial: "When a body of citizens, properly chosen and constituted as a grand jury, finds probable cause to believe that a crime has been committed within its jurisdiction, that finding is sufficient to require a trial."). Defendants' burden in this context is, correspondingly, "a heavy" one. *United States v. Lamoureux*, 711 F.2d 745, 747 (6th Cir. 1983).

**ARGUMENT**

The Indictment alleges that the defendants conspired to commit health care fraud by creating and submitting fraudulent payment claims to DOL, which administers the EEOICPA. The Indictment further explains, in detail, how the EEOICPA operates as a "health care benefit program," as defined in 18 U.S.C. § 24(b). On the one hand, defendants seem to argue, as a

matter of law, that the EEOICPA does not meet the statutory definition of "health care benefit program" in § 24(b). But that definition is unambiguous and broad. It includes "*any* public or private *plan* or contract, affecting commerce, under which *any medical benefit*, item, or service is provided to *any individual*." 18 U.S.C. § 24(b) (emphases added). Under the plain meaning of that definition, and as alleged in the Indictment, the EEOICPA is as a "health care benefit program." On the other hand, defendants seem to argue that, as a factual matter, the EEOICPA does not operate as a "health care benefit program" because it differs from an insurance plan. But the Indictment alleges in detail how the EEOICPA operates as a "health care benefit program," and those factual allegations must be taken as true in this context. Defendants' challenges to the substance of the allegations are for a jury to decide. Neither of defendants' arguments is persuasive, and their motion should be denied.

**A. As a matter of law, the EEOICPA meets the definition of "health care benefit program," as defined in 18 U.S.C. § 24(b).**

**1. The plain meaning of § 24(b) is clear.**

In addressing questions of statutory construction, courts start by examining the plain language of the statute to discern Congress's intent. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003). It is presumed that Congress's intent is expressed in the plain language of a statute. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). In examining the meaning of a statute, courts consider the language of the statute, the specific context in which that language is used, and the broader context of the statute as a whole. *Flores v. U.S. Citizenship and Immigration Servs.*, 718 F.3d 548, 551 (6th Cir. 2013). A "fundamental canon of statutory construction" is that "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute.'" *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 468 (6th Cir. 2021) (quoting *Perrin v. United States*, 444

U.S. 37, 42 (1979) (alteration in original)). If the language of the statute is unambiguous, it is controlling, and the court's inquiry ends. *Desert Palace*, 539 U.S. at 98; *see also Brilliance Audio, Inc. v. Haights Cross Commc'n, Inc.*, 474 F.3d 365, 371 (6th Cir. 2007) ("If the language of the statute is clear, then the inquiry is complete, and the court should look no further."). If the statutory language does not address the precise question or is ambiguous, then the Court must look to traditional tools of statutory interpretation to ascertain Congress's intent, including legislative history, policy rationales, and context. *See In re Carter*, 553 F.3d 979, 986 (6th Cir. 2009); *Cowherd v. Million*, 380 F.3d 909, 913 (6th Cir. 2004).

The plain language of § 24(b) is clear. The term "health care benefit program" is defined as "*any* public or private plan or contract, affecting commerce, under which *any medical benefit*, item, or service *is provided to any individual*, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b) (emphases added). The Indictment alleges that the EEOICPA is a "health care benefit program." [Indictment ¶ 1, 35, 86.] And defendants concede that the EEOICPA provides medical benefits to individuals. [Doc. 63, Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Mem.") at 6.] The only disputed part of § 24(b) seems to be whether the EEOICPA qualifies as a "any . . . plan or contract." 18 U.S.C. § 24(b). The New Oxford American Dictionary defines "plan" as "a detailed proposal for doing or achieving something." New Oxford American Dictionary, Oxford University Press (3d. ed. 2010). Similarly, Merriam-Webster's online dictionary defines "plan" to include "a detailed program (as for payment or the provision of some service)." Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/plan?src=search-dict-box (last visited May 12, 2025). The allegations in the Indictment demonstrate how the EEOICPA is "plan." [Indictment ¶¶ 8-33.]

Defendants attempt to avoid the plain meaning § 24(b) by arguing that the EEOICPA is "solely a compensation plan." [Mem. at 5.] But they also argue that the EEOICPA is "not . . . a workers' compensation plan."[1] [*Id.*] That argument is a tough needle to thread—but ultimately irrelevant to whether the Indictment is sufficient. *Assad*, 2019 WL 3945389, at *5 ("[C]ourts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations."). In any event, the Sixth Circuit has acknowledged the dual-purpose of the EEOICPA "to provide compensation *and other services* to current and former [DOE] employees and contractors . . . ." *Berry v. U.S. Dep't of Labor*, 832 F.3d 627, 630 (6th Cir. 2016) (emphasis added). Those "other services" include home health benefits such as skilled and non-skilled home health services, which are at the heart of the fraud scheme alleged in the Indictment. [Indictment ¶¶ 41-55.]

**2. Courts have routinely rejected arguments for a narrow or constrained reading of "health care benefit program."**

Several circuit courts of appeals have rejected arguments that the definition of "health care benefit program" should be narrowly construed and limited to traditional insurers. *See United States v. Manamela*, 612 F. App'x 151, 152, 155-56 (3rd Cir. 2015) ("Contrary to Manamela's argument in his brief, § 24(b) does not require that a public or private plan or contract be an insurance provider or entity funded by an insurer. If Congress had intended to limit § 24(b) to insurers, it certainly could have done so."); *United States v. Gelin*, 712 F.3d 612, 618 (1st Cir. 2013) ("[T]he statutory definition [of health care benefit program in Section 24(b)]

---

[1] As a factual matter, the EEOICPA does operate like a workers' compensation plan [*see* Indictment ¶¶ 3, 11], and courts have affirmed health care fraud convictions where a workers' compensation plan was a victim. *See, e.g.*, *United States v. Martinez*, 588 F.3d 301, 306 (6th Cir. 2009) (affirming health care fraud conviction where defendant executed a scheme to defraud Medicaid, Medicare, and the Ohio Bureau of Workers' Compensation).

is simple and broad."); *United States v. Lucien*, 347 F.3d 45, 51-52 (2d Cir. 2003) (holding that state's automobile insurance program qualified as "health care benefit program").

District courts have also denied motions to dismiss where, as here, a defendant argued that, as a matter of law, a health plan did not meet the definition of "health care benefit program." *See, e.g.*, *United States v. Wahab*, 21-CR-603 (VEC), 2022 WL 17581560, at *6 (S.D.N.Y. Dec. 12, 2022). The defendants in *Wahab* argued that the National Basketball Association's Health and Welfare Benefit Plan did not meet the definition of "health care benefit program" because "[n]othing about the Plan functions like a traditional health care payer engaged in the provision of medical benefits." 2022 WL 17581560, at *1, 6. In rejecting that argument, *Wahab* applied the tools of statutory construction and found that the definition of "health care benefit program" was clear. 2022 WL 17581560, at *5-6. *Wahab* recognized that "[c]ourts have summarily rejected such a constrained reading of section 24(b) in light of Congress's intent to prohibit health care fraud, broadly defined." 2022 WL 17581560, at *6 (citing *Manamela*, 612 F. App'x at 156; *Lucien*, 347 F.3d at 51).

*Lucien* is instructive because it applied the traditional tools of statutory construction in rejecting a defendant's argument that "health care benefit program" was limited to traditional insurers. 347 F.3d at 52. *Lucien* held that a state's automobile insurance program was a "health care benefit program" because insurers, bound by contract, reimbursed medical providers for fraudulently billed medical expenses incurred on behalf of the defendants, who received a medical benefit from the program. *Id.* ("[A] health care benefit program is, under the statutory definition of § 24(b), plainly implicated."). Defendants' argument here, like the defendant's argument in *Lucien*, is divorced from the statutory definition of "health care benefit program." [*See* Mem. at 7 ("[T]he EEOICPA does not provide the services necessary to qualify as a health

care benefit program.").] *Lucien* held that the state's automobile insurance program operated as a "contract" under § 24(b), but that holding in no way narrowed the definition to exclude health *plans* like the EEOICPA. [*See* Mem. at 7.] *Lucien* also noted that "Congress intended for [section 1347] to include within its scope a wide range of conduct so that all forms of health care fraud would be proscribed, regardless of the kind of specific schemes unscrupulous persons may conduct." 347 F.3d at 51.

**3. The Court need not consider materials outside the plain language.**

Because the plain meaning of "health care benefit program" is clear, the court need not consider legislative history, regulations, or any other extraneous materials.[2] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003).

In any event, the statutory and regulatory schemes of the EEOICPA demonstrate how it operates as a health care benefit program. Both the statute and the regulations address medical benefits under the program. *See* 42 U.S.C. §§ 7384s(b), 7384t, 7385s-8 (addressing medical benefits); 20 C.F.R. § 30.400-30.422 and § 30.700-30.726 ("Medical and Related Benefits" and "Information for Medical Providers") The joint definition of "compensation" and "benefit" underscores how they operate independently. That definition refers to payments made "to *or on behalf of*" a beneficiary, suggesting that compensation is paid directly to a beneficiary while payments for benefits are paid "on behalf of" the beneficiary. 20 C.F.R. § 30.5(g) (emphasis added). The definition goes on to clarify that "compensation," as used in 42 U.S.C. § 7385f(b),

[2] Under traditional tools of statutory construction, if the plain meaning of § 24(b) were not clear—it is—then the Court could look to the legislative history of that statute and § 1347 to discern Congress's intent with respect to health care fraud. *See In re Carter*, 553 F.3d 979, 986 (6th Cir. 2009). Contrary to the defendants' argument, however, the Court would *not* look to the legislative history of the EEOICPA, its statutory scheme, or its accompanying regulations because doing so would not clarify the meaning of "health care benefit program" in § 24(b). [Mem. at 3-5.] The purpose of the EEOICPA and how it operates are factual questions on which the parties seem to disagree. [*Compare* Indictment ¶¶ 8-33 *with* Mem. at 7-8.]

"means only the payments specified in [42 U.S.C. §] 7384s(a)(1) and in [42 U.S.C. §] 7384u(a)"—that is, the $150,000 lump-sum payment to beneficiaries or their survivors. *Id.* § 30.5(g). Compensation is distinct from medical benefits in 42 U.S.C. § 7384s(b), which are paid "on behalf of" a beneficiary. *Id.* § 30.5(g). The definition further underscores that the EEOICPA operates as a health care benefit program by referencing payments for "such things as medical treatment, monitoring, examinations, services, appliances and supplies . . . ." *Id.* § 30.5(g). These are hallmarks of health care benefit programs. The fact that beneficiaries pay no deductibles or copays under the EEOICPA speaks only to the generosity of the EEOICPA—but is irrelevant to whether the EEOICPA is a "health care benefit program." [Mem. at 5.]

**B. Counts Two through Fifteen of the Indictment adequately allege each element of health care fraud, in violation of 18 U.S.C. § 1347.**

Health care fraud, in violation of 18 U.S.C. § 1347, has three elements: (1) defendant knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud. *United States v. Anderson*, 67 F.4th 755, 770 (6th Cir. 2023). Defendants challenge the sufficiency of the allegations only with respect to the definition of "health care benefit program."

To the extent defendants are arguing that the Indictment is insufficient as a factual matter, that argument should be rejected because the Indictment alleges that the EEOICPA is a "health care benefit program" and explains in detail how it operates as such. [Indictment ¶¶ 1, 8-33, 35, 86.] First, beneficiaries receive an identification card, commonly referred to as a "white card," that contains beneficiary's name, case identification number, DOL group number, and DOL logo—a hallmark of a health care benefit program. [*Id.* ¶ 12.] Next, healthcare providers who want to treat EEOICPA beneficiaries and bill the government for their services are required to

enroll with DOL, which administers the program. [*Id.* ¶ 13.] DOL assigns provider numbers to approved applicants. [*Id.*] Finally, enrolled providers submit payment claims to DOL, and DOL requires the providers to certify that the claimed services were actually provided and medically necessary. [*Id.* ¶¶ 15-19.] The providers use specific billing codes when submitting payment claims to DOL. [*Id.* ¶¶ 22-24.] These allegations, which are "accepted . . . as true" at this stage, *McAuliffe*, 490 F.3d at 531, show how the EEOICPA operates as a "health care benefit program." To the extent the defendants are challenging the *substance* of these allegations—that is, whether the government can prove them beyond a reasonable doubt—that "'rest[s] on factual disputes left to the factfinder.'" *Assad*, 2019 WL 3945389, at *5 (quoting *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015)).

The Indictment in Counts Two through Fifteen adequately alleges each element of health care fraud, including that the defendants attempted to execute—and did execute—a scheme to defraud the EEOICPA, a health care benefit program. The Indictment is factually sufficient.

**C. Count One of the Indictment adequately alleges a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.**

Even if the Indictment did not adequately allege that the EEOICPA is a health care benefit program in Counts Two through Fifteen (it does), Count One would stand on its own because the government was only required to allege the elements of conspiracy: "that the defendants agreed to commit [health care] fraud and joined the conspiracy both knowingly and voluntarily." *United States v. Betro*, 115 F.4th 429, 443 (6th Cir. 2024); *see also United States v. Palma*, 58 F.4th 246, 249 (6th Cir. 2023) (discussing conspiracy to commit wire fraud).

Count One does not require the government to allege each element of the substantive offense of health care fraud, in violation of 18 U.S.C. § 1347. "It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the

crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *Wong Tai v. United States*, 273 U.S. 77, 81 (1927). *See also United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 176 (6th Cir. 1992) and *United States v. Ogbazion*, Case No. 3:15-cr-104, 2017 WL 1315813, at *22-23 (S.D. Ohio Apr. 10, 2017) (quoting above language from *Wong Tai*).

Supreme Court precedent makes clear that the government's burden in a conspiracy case is to show that each member of the alleged conspiracy agreed to participate in what he knew to be a collective venture directed toward the commission of a crime. *Salinas v. United States*, 522 U.S. 52, 65 (1997). The essence of a conspiracy is that there must be "an agreement to commit an unlawful act," and as the Supreme Court explained, "[t]hat agreement is 'a distinct evil,' which 'may exist and be punished whether or not the substantive crime ensues.'" *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (quoting *Salinas*, 522 U.S. at 65).

The Sixth Circuit has faithfully applied that precedent. First, in *United States v. Washington*, the court held that where, as here, the government charged a conspiracy, "[it] merely had to prove beyond a reasonable doubt that [the defendant] knowingly and voluntarily joined a conspiracy that intended to fraudulently obtain money and that a member of the conspiracy took at least one overt act in furtherance of the conspiracy." 715 F.3d 975, 980 (6th Cir. 2013) (alteration added). The court reaffirmed that precedent in *United States v. Phillips*, holding that "[t]he government need not prove the elements of fraud to convict [the defendant] of *conspiracy*." 872 F.3d 803, 806 (6th Cir. 2017) (emphasis in original) (alteration added). "'It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues.'" *Id.* (quoting *Salinas*, 522 U.S. at 65).

Count One of the Indictment alleges that the defendants conspired with each other—and others not named in the Indictment—to commit health care fraud, in violation of 18 U.S.C. § 1349. [Indictment, ¶¶ 1, 35-84.] Count One incorporates both elements of the offense, describes the purpose of the conspiracy, and explains in detail how defendants sought to achieve the purpose and objective of the conspiracy. [*Id.* ¶ 35: "defendants MEGAN MULLINS [and] CALEB MULLINS . . . together, and with other persons known to the grand jury but not named here, knowingly and willfully combined, conspired, and agreed to commit healthcare fraud."); *id.* ¶ 36 (alleging that the purpose of the conspiracy was to submit false payment claims to DOL, conceal the submission of those false claims, and divert the proceeds for the defendants' personal use).] The Indictment also describes over forty-seven paragraphs the manner and means of the conspiracy—that is, how the defendants sought to accomplish the object and purpose of the conspiracy. [*Id.* ¶¶ 37-84.] These allegations are sufficient to allege a conspiracy to commit health care fraud, and defendants have not meaningfully argued otherwise.

**D. The statutes at issue are clear and unambiguous.**

Defendant's rule-of-lenity argument should be rejected because the plain meaning of "health care benefit program" in § 24(b) is clear. The rule of lenity "applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." *United States v. Shabani*, 513 U.S. 10, 17 (1994); *see also Shular v. United States*, 589 U.S. 154, 165 (2020). A court may invoke the rule of lenity only "after consulting traditional canons of statutory construction." *Shabani*, 513 U.S. at 17. "In other words, a court must first employ all of the traditional tools of statutory interpretation, and a court may resort to the rule of lenity only 'after seizing everything from which aid can be derived.'" *Shular*, 589 U.S. at 787-88 (Kavanaugh, J., concurring) (quoting *Ocasio v. United States*, 578 U.S. 282, 295, n.8 (2016)). "[W]hen 'a reviewing court employs all of the traditional tools of construction, the court will

almost always reach a conclusion about the best interpretation,' thereby resolving any perceived ambiguity." *Shular*, 589 U.S. at 788 (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanagh, J., concurring)).

The rule of lenity applies only in cases of "grievous" ambiguity—where the court, even after applying all the traditional tools of statutory interpretation, "can make no more than a guess as to what Congress intended." *Ocasio*, 578 U.S. at 295 n.8. "The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Muscarello v. United States*, 524 U.S. 125, 138 (1998). Under the Supreme Court's "longstanding precedents, the rule of lenity applies when a court employs all of the traditional tools of statutory interpretation and, after doing so, concludes that the statute still remains grievously ambiguous, meaning that the court can make no more than a guess as to what the statute means." *Shular*, 589 U.S. at 788 (Kavanaugh, J., concurring).

Defendants invoke the rule of lenity with respect to the definition of "health care benefit program" in § 24(b). [Mem. at 10-11.] But their argument is not based in the tools of statutory construction. They argue that the definition of "'health care benefit program' does not unambiguously include the EEOICPA," and that including the EEOICPA within that definition would be "ambiguous" and "would result in an overly broad and uncertain interpretation of § 24(b)." [Mem. at 10-11.] But that argument has it backwards. The question is whether the definition of "health care benefit program" in § 24(b) is "grievously" ambiguous. *Ocasio*, 578 U.S. at 295 n.8. On that question, defendants make no argument other than to suggest that the definition does not include the EEOICPA "because [the EEOICPA's] purpose is compensatory, not the provision of health care." [Mem. at 10.] But defendants concede that the EEOICPA

provides medical benefits to individuals [*see* Mem. at 6], and they fail to point to any part of § 24(b) that is ambiguous. As a result, this Court should reject their rule-of-lenity argument.

## Conclusion

Because the Indictment is both constitutionally and legally sufficient, defendants' motion to dismiss should be denied.

Respectfully submitted,

Francis M. Hamilton III
United States Attorney

By: *s/ William A. Roach, Jr.*
William A. Roach Jr., Tenn. No. 028349
Jeremy S. Dykes, Maryland Bar Member
Assistant United States Attorneys
800 Market Street, Suite 211
Knoxville, Tennessee 37902
william.roach@usdoj.gov
jeremy.dykes@usdoj.gov
(865) 545-4167